402 A.2d 500

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Sondra HELM, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 18, 1979.

Decided May 1, 1979.

Frank M. Jackson, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty. Cynthia H. Severinsen, Philadelphia, for appellee.

Before EAGEN, C. J., and ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

Appellant, Sondra Helm, was arrested and charged with murder, voluntary manslaughter, and involuntary manslaughter. Appellant was tried before a judge, sitting without a jury on July 9, 1976. At trial, the prosecution certified that the murder charges rose no higher than murder in the third degree. The trial court found appellant guilty of voluntarily manslaughter. Post-verdict motions were denied, and a sentence of eighteen months to three years imprisonment was imposed. This direct appeal followed.

The charges against appellant arose out of the stabbing death of James Harvey. That stabbing took place at appellant's apartment on the afternoon of April 6, 1976. The prosecution's evidence consisted, in its entirety, of the testimony of a police officer as to the contents of a statement

given to him by appellant after her arrest on the evening of April 6, 1976, and of stipulations to the effect that James Harvey died on that date of a single stab wound to the chest. Appellant's statement said in relevant part,

"When we got back to the house Goobie [a friend of appellant's] came into the house to try some Chianti Wine and he did. We was talking for a while then Goobie left. My daughter came in from school and I was getting ready to fix [Harvey's] chicken and call my mother to tell her I was coming over in a half hour or an hour. Dee, my daughter, came in and was sitting next to [Harvey] in the kitchen eating a steak. He took a couple bites of her steak and she told him he wasn't going to eat it all. I told him he could wait for the chicken because it was almost ready. Then he started accusing me of things and then I asked for my keys and told him to get his things. He said, 'Oh, did Goobie tell you to get your keys?' He started insinuating things that wasn't true and started hitting me and knocking me down on the kitchen floor. He pulled my hair and hit my head on the floor. I told him to get the hell off of me, get his clothes and go back to where he used to stay. I went in the bedroom and we had some more words and he knocked me down and hit me in my face. My daughter told him it didn't make sense for him to hit me and I was carrying his baby. He said how he know it was his. I said, 'Is that what you really mean?' He didn't answer. I said, 'Give me my keys and you can go ahead.' He asked me, 'Is that what your friend said, get your keys?' I said, 'No, didn't nobody tell me to get anything cause don't nobody tell me what to do. I just want you to stop hitting me.' He threw my keys to the kitchen back door and I was going to get them and he grabbed me. I pushed his hand away and my daughter said, 'You're not going to hit my mother anymore.' I was looking in the drawer for a knife cause I wasn't going to get hit anymore. He was standing by the sink on the left-hand side. I was on the right-hand side and Dee was in the middle. I grabbed the knife. He reached out to hit

me and I came up with the knife and hit him. I didn't realize I had hit him until I saw the blood.

. . . . .

"Question. Where did you go after the stabbing?
Answer. He wanted me to go to the hospital with him but I can't drive a stick. So he drove. I asked him to get somebody to drive but he said he'd rather do it, just for me to come with him. He drove until he couldn't drive any further and stopped at the Community Bar cause he had to go to the bathroom. I tried to find somebody to drive. I stopped some boys and told them to call the emergency wagon and it came up.

. . . . .

"Question. Mrs. Helm, how many months pregnant are you?
Answer. Six months."

The detective also testified that he had verified that appellant was pregnant at the time of the incident.

Following the close of the prosecution's presentation of evidence, the trial court denied appellant's demurrer, and she took the stand and testified. Appellant said that the argument started over two men, George and Goobie. She said that Harvey knocked her away from the stove to the floor while she was frying chicken and that she got up and ran into the bedroom where he followed her. She asked for the apartment keys. According to her testimony, Harvey knocked her to the bedroom floor and began choking her and hit her head against the floor. She said she got up and went back to the kitchen. Harvey followed, although her daughter was between them. Appellant asked for the keys again and Harvey threw them on the floor. Appellant testified that her daughter then said, "You're not going to hit my mother again." With that, according to appellant, the victim "went to lunge" at her; the drawer was open and she grabbed the steak knife. She continued, "Well, I didn't even know I had stabbed him because it seemed to me I just brushed past him. Then I seen the blood and the knife just

jumped out of my hand." Appellant also testified that Harvey carried a switchblade knife and that she was afraid for her health and safety and that of her unborn child. She did not say that she saw the switchblade knife that afternoon, however.

Appellant's teenage daughter also testified for the defense. She corroborated her mother's testimony that the argument started over two men, George and Goobie, and her testimony was in basic agreement with her mother's as to what transpired. Only one difference existed between appellant's testimony and that of her daughter: appellant testified that she did not see the knife during the fight although she knew he normally carried one, while her daughter testified that at one point during the fight, when her mother was on the floor, the victim tried to stab her mother with a knife with a Chinese design on it, but that the knife got stuck in a chair.

Appellant contends that the evidence presented was insufficient to establish her guilt of voluntary manslaughter beyond a reasonable doubt. Specifically, appellant contends that she should have been acquitted because the evidence raised the issue of whether or not she was acting in self-defense at the time she stabbed Harvey, and that the prosecution has failed to prove beyond a reasonable doubt that appellant did not act in self-defense. We have viewed the evidence in the instant case in the light most favorable to the prosecution, as we must when asked to review the sufficiency of the evidence to sustain a conviction, and have accepted as true all the evidence, and all reasonable inferences deducible from it, upon which, if believed, the factfinder could have based its verdict. *Commonwealth v. Horton*, 485 Pa. 115, 401 A.2d 320 (1979). *Commonwealth v. Cropper*, 463 Pa. 529, 345 A.2d 645 (1975). Having so reviewed the evidence, we conclude that the prosecution has failed to sustain its burden of proving appellant's guilt beyond a reasonable doubt.

As we said in *Cropper, supra*, 463 Pa. at 537–538, 345 A.2d at 649,

"[W]hen there is evidence at trial from whatever source that a killing may have been done in self-defense, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense."

■ Before we can say that the prosecution has met that burden, our review of the evidence must show that at least one of the following has been established beyond a reasonable doubt:

"(1) that the defendant did not reasonably believe she was in danger of death or serious bodily injury,

(2) that the defendant provoked the use of force, or,

(3) that the defendant had a duty to retreat, and that retreat was possible with complete safety.

Establishment beyond a reasonable doubt of any one of these three elements will insulate the conviction from a defense challenge to the sufficiency of the evidence in a case where self-protection is at issue."

*Commonwealth v. Eberle*, 474 Pa. 548, 554, 379 A.2d 90, 93.

Turning to the facts of the instant case we find that, as to the first of the *Eberle* requirements, the trial court concluded: "[Appellant] could not have believed . . . that it was necessary to kill in order to save herself from death or great bodily harm." As to the second element, the trial court found that "[appellant] clearly was free from fault in provoking or continuing the difficulty which resulted in the killing." As to the third element of the *Eberle* test, the trial court concluded that appellant had ". . . violated the duty to retreat."

■ Our task, therefore, is to determine whether the prosecution has established beyond a reasonable doubt that appellant did not reasonably believe she was in danger of death or serious bodily harm (the first element of the *Eberle* test), and whether the prosecution has established beyond a reasonable doubt that appellant violated a duty to retreat (the third element). The trial court's conclusion that appellant was free from fault in provoking or continuing the

incident (the second element) is amply supported by the record.

We must disagree with the trial court regarding the first element of the *Eberle* test; the evidence in this case fails to prove beyond a reasonable doubt that appellant did not reasonably believe she was in danger of death or serious bodily injury.

■ The trial court's conclusion that appellant "could not have believed . . . that it was necessary to kill in order to save herself from death or great bodily harm," is not a finding of fact of the kind that must be accepted by an appellate court. Although that conclusion may be considered a factual one, it is a conclusion which requires that certain inferences first be drawn from the basic facts. An appellate court is free to reject such factual conclusions when they are not sustained by the underlying facts. *Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965).

■ In this case, the trial court accepted the underlying facts as described by appellant in her statement to the police and in her trial testimony, stating, "the victim's conduct did constitute serious provocation sufficient to reduce this homicide, which was caused by the infliction of a stab wound to a vital part of the body, from murder to voluntary manslaughter." Nevertheless, the trial court concluded that appellant could not have believed she was in danger of death or serious bodily harm. We disagree. The victim's provocation was serious enough to cause a *reasonable belief* by appellant that she was in danger of death or serious bodily harm. The *uncontradicted evidence* revealed that the stabbing occurred during an argument in which the victim pursued appellant throughout the apartment, beat her, knocked her down several times, choked her, and repeatedly hit her head against the floor—all of this at a time when appellant was six months pregnant. This evidence is all that was presented at trial. At no time did appellant state that she did not think herself in danger of serious injury or death from

Harvey's unprovoked attack upon her. Given these facts, we are unable to conclude beyond a reasonable doubt that appellant could not have reasonably believed that she was in danger of death or serious bodily injury.

The prosecution points out that appellant and Harvey were approximately the same size. Assuming that this would be significant given the above circumstances, there is simply no evidence to sustain the prosecution's contention. There was some testimony that the victim was slightly taller than the appellant, but that is all. There was no evidence concerning the relative weights, or strengths, of the parties, and the basic facts leave no doubt that appellant was getting the worst of the fight. The prosecution also states that there was testimony that appellant had previously "pulled a knife on the victim." Assuming the truth of this statement for the moment, it might be relevant to establish that appellant was the aggressor at the time of the stabbing; there is, however, no evidence to that effect, and the trial court correctly found that it was the victim who provoked the incident. In any event, the prosecution's statement that there was testimony that the appellant had previously pulled a knife on the victim is incorrect. After stating on page three of its brief that there was such testimony, the prosecution tells us—more accurately—ten pages later that there was no such evidence. First the prosecution says, "There was testimony that [appellant] pulled a knife on the victim previously." Later, the prosecution states, ". . . there was no *evidence* that [appellant] had tried to stab the victim or pull a knife on him previously." The latter portion of the prosecution's brief is the accurate portion. While cross-examining appellant's daughter, the prosecuting attorney asked a leading question that implied appellant had previously pulled a knife on the victim. This implication was denied by appellant's daughter and no other inquires were ever made about the matter.

The prosecution has appended to its brief an out-of-court statement given by the daughter to the police in which the daughter stated that she had seen her mother pull a

knife on the victim on a previous occasion. We must completely ignore this statement in reviewing this case. First of all, as the prosecution concedes, the statement was not put into evidence and, therefore, is not before us; and, secondly, there is nothing in the statement indicating the circumstances under which such an incident occurred and whether or not it was similar to the incident at issue here where the victim was assaulting appellant.

Appellant's conviction can be sustained, therefore, only if the prosecution has established beyond a reasonable doubt that she had a duty to retreat, and that she would have been able to retreat with complete safety. As we said in *Commonwealth v. Eberle, supra,* 474 Pa. at 553, 379 A.2d at 93,

"Retreat is not required by 505(b)(2)(ii)(A) in some situations:

'the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be   .   .   .'

This portion of the statute represents a change from the prior law. Previously, one had no duty to retreat from one's dwelling, even if retreat could have been effectuated with safety, unless the retreat was from a member of the same household who had an equal right to be in the dwelling. (Citations omitted).

In the above statute that standard is adopted for a place of work but not for a dwelling. The actor therefore is not required to retreat from his dwelling."

The argument between appellant and Harvey occurred in appellant's home. She was therefore under no duty to leave it. Even if she had had such a duty, however, the evidence failed to establish that she could have effectuated such a retreat with safety. Her statement indicates that she stabbed Harvey while she, Harvey, and her daughter were in the kitchen:

"He was standing by the sink on the left-hand side. I was on the right-hand side and Dee was in the middle. I

grabbed the knife. He reached out to hit me and I came up with the knife and hit him."

Her statement also indicates that the kitchen had a door. Nowhere in the record, however, is there any evidence as to where that door was located relative to the sink or to the position of the parties. There is, therefore, nothing to show that appellant could have escaped through it to safety. The prosecution has thus failed to negate beyond a reasonable doubt that appellant violated any duty to retreat.

We note one other matter. At one point in its opinion, the trial court states—referring to appellant and her daughter's testimony—"[n]either rated high on the scale of credibility." Nevertheless, the trial court accepted the version of the incident testified to by appellant. The prosecution suggests that the trial court's statement was made because it was "presented with two conflicting versions of fact with respect to [appellant's] claim of self-defense." This contention is totally without merit. We have reviewed the trial court's opinion and can find only one area in which the trial court refers to facts which could conceivably indicate a conflict between appellant's testimony and her daughter's testimony. The trial court stated: "Appellant said that the argument started over two men, George and Goobie." Later, the trial court said appellant's daughter testified that the argument was over turning the TV off and on. Although the daughter testified that at one point in the argument there was disagreement between her mother and Harvey about turning the TV on and off, her testimony cannot be fairly read as contradicting appellant's. That testimony is as follows:

"BY [THE ASSISTANT DISTRICT ATTORNEY]:

Q. What were you doing when you were at the table?

A. Eating.

Q. And what was James doing?

A. Drinking a can of beer.

Q. Now, when you finished eating, did anything happen?

A. Yes, him and my mom got in an argument.

Q. *Could you tell us what that argument was about, if you remember?*

A. *Goobie and George.*

Q. *Tell us what that argument was.*

A. *Well, they was arguing about them two,* they be drinking and stuff together.

Q. Now, after the argument did anything happen between James and your mother?

A. Yeah, they started fighting.

Q. Will you describe to us what you mean by "they started fighting"?

A. Well, they went into the bedroom and they was arguing—no, first he turned on the TV and then she said, "Turn it back off." And then he turned on a tape and she wanted to listen to her stories. So they started—he kept nagging her about it and they just started arguing and fighting."

(Emphasis added.)

The prosecution also suggests that a contradiction existed between appellant's testimony regarding whether or not Harvey was armed with a knife during the incident. Appellant testified that, she knew the victim carried a switchblade knife, but that she did not see it during the incident; appellant's daughter testified that she did see the knife. As we have noted earlier, even if the victim did not use a knife when he assaulted appellant, the circumstances preceding the stabbing were sufficient to cause appellant to reasonably believe that she was in danger of death or serious bodily harm. Furthermore, we see no such conflict between appellant's testimony and that of her daughter. Appellant testified that she did not see the knife; her daughter testified that when she saw the knife, appellant had been pushed to the floor by Harvey. The matter was not pursued further.

A verdict of guilty of a criminal offense can never be taken lightly. It is for this reason that our system of justice places the burden on the prosecution to establish all elements of the crime beyond a reasonable doubt. In this case the prosecution has failed to meet its burden.

Judgment of sentence is reversed, and appellant is discharged.

O'BRIEN, J., did not participate in the consideration or decision of this case.

ROBERTS and LARSEN, JJ., concurred in the result.