420 A.2d 427

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Donald R. FISHER, Appellant.**

Supreme Court of Pennsylvania.

Argued May 20, 1980.

Decided Sept. 22, 1980.

**2.** The jury was in fact informed of the victim's proclivity towards playing with fire and gun powder.

232

Victor Dell'Alba, York, for appellant.

Thomas J. McCullough, York, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellant was convicted of voluntary manslaughter by a jury in the Court of Common Pleas of York County. Post–verdict motions were denied, and sentence of imprisonment

for a period of two to four years was imposed on August 17, 1979. This direct appeal followed.

■ The principal issue is whether the evidence supports the jury's finding of voluntary manslaughter or whether, on the contrary, it establishes the killing was an act of self–defense. In making this determination, we must view the evidence admitted at trial in the light most favorable to the Commonwealth and draw all reasonable inferences in favor of the Commonwealth. *Commonwealth v. Robinson*, 468 Pa. 575, 364 A.2d 665 (1976); *Commonwealth v. Bastone*, 466 Pa. 548, 353 A.2d 827 (1976). So viewed, the record reveals the following:

Appellant, Donald R. (Skip) Fisher, was married to Joanne Fisher for seventeen years, separated in 1978, and divorced in July 1978. After the separation, Joanne maintained an apartment and was seeing the victim, Danny McLaughlin. In June 1978, five months before the incident involved in this case, Fisher arrived at Joanne's apartment to pick up their youngest daughter for an outing and saw McLaughlin on the couch. Following that chance meeting, Fisher twice stated to Joanne that he was going to kill her "nappy–haired bearded hippie boyfriend." In September 1978, approximately two months before the incident, Fisher spoke to Joanne by telephone and stated that he knew who her boyfriend was. He warned her not to see him and threatened "to blow him away." In October 1978, Joanne began living with McLaughlin at his apartment.

On the evening of November 2, 1978, several telephone calls were made between McLaughlin and Fisher. The calls to Fisher's home were initiated by McLaughlin who believed Fisher was responsible for vandalizing his garage and tried to get him to admit it. Beginning about 8 p. m., McLaughlin made five or six calls to Fisher's residence and two calls to Fisher at other locations. Furthermore, several calls were made that evening by Fisher to McLaughlin. Following the last call, which occurred around 11 p. m., McLaughlin stated he was going to his garage to meet the police. Joanne Fisher testified that McLaughlin was intoxicated

that evening and did not have complete control of his mental faculties. "[H]e was acting different from what he normally acted; he was very angry. I had never seen him like that before."

Although no Commonwealth witness testified to overhearing McLaughlin and Fisher make plans to meet that evening, they did, in fact, meet shortly after midnight, presumably by prearrangement, on the Iron Bridge in Fairview Township, York County. Fisher arrived first and parked off the bridge instructing his sixteen–year–old son to remain in the car. He proceeded onto the bridge and waited for a time until McLaughlin drove up in his Scout, stopped on the bridge, got out carrying a .38 magnum pistol, and approached Fisher, who was unarmed and standing to the rear of the Scout. When McLaughlin was approximately four to six feet away, he shot Fisher in the right leg slightly above the knee.

The shot, which forced Fisher to the ground, was followed by a scuffle during which a second shot was fired which hit neither Fisher nor McLaughlin. At some point during the scuffle, Fisher grabbed the barrel of the gun and began hitting McLaughlin about the head with the pistol butt. Fisher left the scene aided by his son. Immediately thereafter, McLaughlin was found on the bridge roadway behind the Scout. He was lying on his stomach with his head in a pool of blood but still alive. He died shortly thereafter in a hospital. Fisher and his son returned to their home and immediately telephoned Chief of Police Smith who arrived eight minutes later and took possession of the gun which Fisher had carried home with him.

As a result of the incident, Fisher sustained injuries to the face and a through–and–through bullet wound to the right leg for which he was hospitalized twenty–seven days. McLaughlin suffered fourteen blows about the face, forehead, and back of head. Ten of the blows, described as direct, rather than looping, were to the back of the head and caused multiple skull fractures. There was medical testimony that the blow or blows which caused the fractures would

have left McLaughlin prostrate with little capacity for movement.

It is undisputed that Fisher delivered the fatal blows to McLaughlin. Fisher maintains, however, that the killing was committed in self–defense and was, therefore, justifiable. Statutory authority for the defense of self–protection is found in section 505(a) of the Crimes Code which provides:

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."

18 Pa.C.S.A. § 505(a). See also *Commonwealth v. Cain*, 484 Pa. 240, 398 A.2d 1359 (1979); *Commonwealth v. Mahoney*, 460 Pa. 201, 331 A.2d 488 (1975); *Commonwealth v. Wrona*, 442 Pa. 201, 275 A.2d 78 (1971); *Commonwealth v. Roundtree*, 440 Pa. 199, 269 A.2d 709 (1970); *Commonwealth v. Johnston*, 438 Pa. 485, 263 A.2d 376 (1970).

■ When there is evidence presented at trial that a killing was committed in self–defense, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self–defense. *Commonwealth v. Helm*, 485 Pa. 315, 402 A.2d 500 (1979); *Commonwealth v. Hinchcliffe*, 479 Pa. 551, 388 A.2d 1068 (1978); *Commonwealth v. Lynch*, 477 Pa. 390, 383 A.2d 1263 (1978); *Commonwealth v. Cropper*, 463 Pa. 529, 345 A.2d 645 (1975). In order to meet that burden, the Commonwealth must establish one of the following elements beyond a reasonable doubt:

(1) that the defendant did not reasonably believe it was immediately necessary to kill in order to protect himself against death or serious bodily harm, or that the defendant used more force than was necessary or reasonably appeared to him to be necessary to save himself from death, great bodily harm or the commission of a felony, (2) that the defendant provoked the use of force, or (3) that the defendant had a duty to retreat and that retreat was possible with complete safety.

See 18 Pa.C.S.A. § 505(b)(2). See also *Commonwealth v. Helm,* supra; *Commonwealth v. Eberle,* 474 Pa. 548, 379 A.2d 90 (1977); and *Commonwealth v. Wrona,* supra. As this Court stated in *Eberle,* "[e]stablishment beyond a reasonable doubt of any one of these three elements will insulate the conviction from a defense challenge to the sufficiency of the evidence in a case where self-protection is at issue." *Id.,* 474 Pa. at 554, 379 A.2d at 93.

Fisher maintains the Commonwealth failed to establish beyond a reasonable doubt any of the three aforementioned elements necessary to sustain its burden and, therefore, the evidence against him was insufficient to sustain the conviction as a matter of law.

■ As to the second element, two of the Commonwealth's own witnesses supported Fisher's claim that he bore no responsibility for provoking the use of force inasmuch as the initial shot was fired without warning by the decedent after he stated simply, "So you're Skip Fisher." One Commonwealth witness who drove across the bridge during the incident testified that the driver of the Scout got out and walked to the rear carrying a gun with a long barrel. The witness stated that, as he reached the other side of the bridge, he heard a shot and shortly thereafter, a second shot. The second Commonwealth witness, who was also a passing motorist, testified that she heard the first shot and saw the flash of gunfire as she turned and looked directly at the scene. She saw a person on the ground holding his leg up close to his body and a second person standing above him holding a heavy object that could have been a gun. There was no evidence that Fisher carried a weapon of any kind to the meeting at the bridge.[1] The gun which Fisher turned over to police was registered to McLaughlin, and a second

---

1. Fisher testified that he agreed to the meeting for the purpose of discussing the effect on his children of McLaughlin's harassing telephone calls to his home. He stated that McLaughlin assured him he would come to the bridge unarmed and alone. Fisher stated further that he would not have gone to the scene if he had known McLaughlin was armed although he acknowledged that he was prepared for a fist fight if that became necessary to settle things.

loaded gun was removed at the hospital from a shoulder holster worn by McLaughlin.

As to the third element, it is clear the Commonwealth could not have established beyond a reasonable doubt that Fisher was able to retreat with safety since he was stunned and incapacitated by a serious gunshot wound to the knee and several pistol slaps to the face and head. Thus, our only task is to determine whether the Commonwealth established the first element beyond a reasonable doubt, that Fisher did not reasonably believe he was in danger of death or serious bodily harm and did not reasonably believe he was required to protect himself by deadly force.

▪ In summary, the Commonwealth's evidence established that there was antagonism between McLaughlin and Fisher and that Fisher had made verbal threats against McLaughlin some months earlier. It further showed that McLaughlin initiated a series of accusatory telephone calls to Fisher on the night of the incident and arrived at the bridge angry, drunk, and armed with two guns while Fisher arrived unarmed and accompanied by his teenage son. Commonwealth witnesses corroborated Fisher's claims that McLaughlin fired, knocked him to the ground, and seriously wounded him and that McLaughlin was directing the gun at Fisher when Fisher grabbed for the gun, scuffled with McLaughlin, and beat him about the head with the butt of the pistol.

Fisher's testimony, corroborated by the testimony of his son, was, in pertinent part, as follows:

"My leg went down–or I went down, my leg went out from underneath me and it was a very bad burning sensation, about all I could do was hold my leg, that is all I wanted to do is kind of hug my leg up to me and he walked over and he slapped me a couple of times with that–what kind, .44 or whatever it is . . .

"Well, after he hit me a couple of times I kind of went blank, I didn't go out but I didn't have my full faculties but I really remember is the barrel very hard on my

temple and he kept saying, 'Put your hands on your ass, I told you on the phone I'm God and I'm going to blow . . .

" 'I'm going to blow your mother fuckin brains out.'

"I started putting my--it happened much faster than I can say--I started putting my hands on my ass because I really was beat and then I thought, why should I just lay here and die like this without even trying to do something. And I just all of a sudden reached up and I grabbed the barrel, I just yanked it, and grabbed the barrel and it went off right away.

"So we started wressling [sic] over it and I got it from him, I don't know the positions we were exactly in or where we were at, we wressled [sic], got the pistol, hit him a couple of times, he got the pistol back from me, I got the pistol away again, I beat him and I couldn't get out from underneath him, I couldn't move, I just kept beating until I felt that he didn't have ahold of me no more."

The pathologist called by the Commonwealth testified that McLaughlin suffered fourteen blows to the head, ten of them to the back. As to the effect of these injuries on the victim's ability to move, the pathologist testified as follows:

"There were a series of injuries or blows so that in the beginning there would have been some chance because the brain was not fractured, there would have been a chance of movement but I feel after all fourteen (14) injuries that probably the patient would have been prostrate or would have been laying on the ground, would have had very little capacity for movement."

In dismissing Fisher's post-trial motions, the court reasoned that the issue of excessive force was properly put to the jury to decide whether Fisher beat the victim only until he was subdued and no longer a threat to him, or whether one of the early fourteen blows neutralized the victim's threat of further harm and Fisher deliberately inflicted additional blows to the victim's head until he was mortally

wounded. We have concluded it was error to submit to the jury the issue of excessive force since the Commonwealth's evidence was insufficient to establish beyond a reasonable doubt that Fisher did not reasonably believe it was necessary to use such force in order to save his own life. Compare *Commonwealth v. Mayes*, 268 Pa.Super. 557, 408 A.2d 1143 (1979).

■■■■ The Commonwealth could not defeat Fisher's claim of self–defense by showing that he delivered more blows than necessary as long as he was in the heat of conflict and reasonably believed he was fighting for his life. See *Brown v. United States*, 256 U.S. 335, 344, 41 S.Ct. 501, 502, 65 L.Ed. 961 (1921); *Inge v. United States*, 356 F.2d 345 (D.C. Cir. 1966). Since there was no direct evidence of deliberate excessive force and since the pathologist offered no opinion as to which of the fourteen blows fractured McLaughlin's skull and thus, subdued him, the Commonwealth failed to show beyond a reasonable doubt that Fisher's belief as to the amount of force necessary to protect himself from imminent death or further serious bodily injury was unreasonable. Clearly, provocation by the victim was serious enough to cause a reasonable belief of imminent danger. See *Commonwealth v. Helm*, supra. Further, the immediate circumstances surrounding the altercation, *viz.* that Fisher and the victim were struggling for control of a gun and that Fisher was stunned and incapacitated by serious injuries inflicted only moments before by the victim–were adequate to justify Fisher's belief that the amount of force he used was necessary.

Therefore, we conclude that the Commonwealth did not meet its burden of proving the absence of self–defense beyond a reasonable doubt. Thus, the evidence was not sufficient, as a matter of law, to support Fisher's conviction for voluntary manslaughter.

Judgment of sentence reversed, and appellant discharged.