594 A.2d 672

**COMMONWEALTH of Pennsylvania**

v.

**Douglas GELBER, Appellant.**

Superior Court of Pennsylvania.

Argued May 7, 1991.
Filed July 10, 1991.

Dennis J. Cogan, Philadelphia, for appellant.

Kathy Echternach, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

Before ROWLEY, President Judge, and CIRILLO and JOHNSON, JJ.

JOHNSON, Judge:

Following a jury trial, Douglas Gelber was convicted of Murder in the Third Degree and Possession of Instruments of Crime. Post-verdict motions were heard and denied, and Gelber was sentenced to seven to fifteen years' imprisonment. We affirm.

On appeal, Gelber presents five issues for our review which may be stated as follows:

 I. Whether sufficient evidence was presented at trial to support a finding of malice and a finding that the defendant had not acted in self-defense.

 II. Whether a statement made to police was the result of an illegal arrest or a denial of the defendant's right to counsel.

 III. Whether the admission of evidence regarding defendant's prior drug related activities constituted prejudicial error.

 IV. Whether the statement in the prosecutor's closing argument that the defendant was a "stone-cold drug addict" who was "strung out on drugs" at the time of the killing was supported by the record.

 V. Whether the trial court abused its discretion by refusing to grant a new trial based upon recanted testimony.

Initially, Gelber contends that the Commonwealth failed to establish by sufficient evidence the element of malice, a necessary element to a conviction for murder. He also contends that the Commonwealth failed to prove, beyond a reasonable doubt, that the killing was not in self-defense. When reviewing an attack upon the sufficiency of the evidence, our standard of review is well established. The sufficiency of the evidence must be evaluated upon the

entire trial record. *Commonwealth v. Meadows*, 471 Pa. 201, 369 A.2d 1266 (1977). All of the evidence must be read in the light most favorable to the Commonwealth, and the Commonwealth is entitled to all reasonable inferences arising therefrom. *Id.* An attack upon the sufficiency of the evidence admits all the facts which the Commonwealth's evidence tends to prove, but contends that such facts fail to establish, beyond a reasonable doubt, the elements of the crimes for which the defendant has been convicted. *Id.* So viewed, the record reveals the following:

Doug Gelber had been involved with the use of drugs since high school, and, in the later years, he became involved in the sale of drugs. During this period, he became friendly with one Michael Wallace with whom he used and sold drugs.

Throughout 1986, both Gelber and his wife were unemployed. That year and during the first several months of 1987, Gelber's father tried to help Gelber through financial difficulties, contributing between $35,000 and $40,000. Mrs. Gelber started to work early in 1987, and became more insistent that Gelber also find a job. Consequently, Gelber lied to his wife and told her that he had found work. For three weeks, Gelber left the house each morning, telling his wife that he was going to work when, in fact, he was spending time with Wallace consuming and selling drugs. Gelber had told Wallace recently that, because of pressing financial problems, he wanted to purchase cocaine for resale to "his customers." Wallace had tried unsuccessfully to help Gelber borrow the necessary money to make such a purchase.

Jesus Jimenez, the victim, had moved from New York to Philadelphia in the Summer of 1987. He met Wallace, and Wallace promised to help him sell drugs. In late June, Jimenez returned to New York and borrowed several thousand dollars so that he could purchase two ounces of cocaine to sell to a "blancito," *i.e.*, a white man, in Philadelphia.

On July 1, Wallace was arrested on unrelated charges. From jail, he arranged a conference telephone call between himself, Jimenez and Gelber. Gelber and Jimenez discussed prices for the cocaine which Jimenez was to sell to Gelber.

Later that evening, Gelber went to the home of Wanda Singleton, Wallace's girlfriend, to meet Jimenez. Gelber purchased a small amount of cocaine from Jimenez but expressed dissatisfaction with its quality. Jimenez assured Gelber that he had a better grade of cocaine available, and they agreed to meet on a street corner five to six blocks from Gelber's home the next day for a transaction.

Gelber and Jimenez met at the appointed time, and Gelber suggested that they complete the transaction at his home as it was raining. Gelber knew that his son and the baby-sitter, based on their daily routine, would be out of the house for several more hours.

Jimenez was killed shortly after arriving at Gelber's home. He died from multiple stab wounds to the areas of the face, shoulder, chest, ribs, spinal column, lung, liver and back. There were also numerous defensive wounds to his hands and arms. Gelber dragged Jimenez' body to the basement and wrapped and tied it with various fabrics and clothesline. He then cleaned up the blood and straightened the furniture so that no one would be aware of what had transpired.

Jimenez' dead body remained in Gelber's basement for about a week. Gelber decided to dispose of the body by dumping it in Cianfrani Park where it was found by workers the following morning. The police were notified. Detectives followed drag marks from where the body was found through several streets. The marks ended at a gate which opened onto a common yard for several houses, one of which was Gelber's. The gate to the yard was ajar, and the detectives observed a woman and a child inside the yard. The officers identified themselves and asked to see the man of the house. The woman called into the house and a man's voice replied that he would be right down.

Gelber appeared, asked the detectives to be seated and offered them a drink. He professed no knowledge of the drag marks or of any dead person. He did suggest that the owner of one of the other houses sharing the common yard might be a good person to question. At various times during the day, police detectives returned to Gelber's yard to speak with him. By that afternoon, Mrs. Gelber returned home and expressed concern that her husband was being interviewed.

A detective canvassing the area for evidence recovered a piece of rope from a nearby trash can. The rope resembled the rope which bound the body and appeared covered in blood, but it had not been discovered when the can was checked several hours earlier.

The detectives sent for a search warrant for Gelber's house. While awaiting the delivery of the warrant, Gelber started to enter the house and was told he could not do so unless accompanied by a detective. Detective Dougherty entered the house with Gelber, at which time Mrs. Gelber told Gelber not to say anything until he talked with an attorney. Mrs. Gelber also entered the house and, while she was attempting to locate an attorney, Gelber indicated that he wanted to go to the bathroom upstairs. Gelber, accompanied by Detective Dougherty, went upstairs where both he and the detective used the bathroom.

While upstairs, Gelber indicated that he did not want to talk in his wife's presence but wanted to give a statement to the detective. Following *Miranda* warnings, Gelber admitted to having killed Jimenez. Gelber claimed that Jimenez had attempted to rob him with a knife, and that he was merely defending himself. In explaining the killing, Gelber stated that "coke was a big problem for him, that he had no job and it had gotten to be very expensive." N.T., September 21, 1989, at 49. He also stated that "he needed help for the coke problem that he had because it was costing so much money." *Id.* at 51. Mrs. Gelber finally located an attorney who talked with Gelber and the detectives. Shortly thereafter, Gelber was arrested.

It is undisputed that Gelber killed Jimenez. Gelber maintains, however, that the killing was committed in self-defense and was, therefore, justifiable. He argues that the evidence presented was insufficient to establish either that the killing was done with malice, a required element in a prosecution for murder, or that the killing was not done in self-defense. The relationship between malice and self-defense has recently been addressed by our Supreme Court.

> "[I]n a prosecution for murder, evidence of provocation or self-defense tends to negate the malice required to prove murder." *Commonwealth v. Heatherington*, 477 Pa. 562, 568, 385 A.2d 338, 341 (1978). Further, in order to meet its burden of proof on the element of malice, the Commonwealth must exclude self-defense beyond a reasonable doubt. *Id.*

*Commonwealth v. Carbone*, 524 Pa. 551, 560, 574 A.2d 584, 589 (1990). It is therefore appropriate that we consider Gelber's arguments on these issues together.

Gelber asserts first that the only evidence "which dealt specifically with the killing came either directly or indirectly from the defendant." Appellant's Brief at 46. He notes that it was the Commonwealth that introduced his statement that he had killed Jimenez in self-defense. He asserts that, although "malice may be inferred from the intentional use of a deadly weapon on a vital part of the body, that inference is not permitted where it is negated by other evidence *presented by the Commonwealth*." Appellant's Brief at 48 (emphasis by Appellant).

In support of this proposition, we are directed to *Commonwealth v. Caye*, 465 Pa. 98, 348 A.2d 136 (1975). In that case, Caye shot and killed a man who had forced his way through a padlocked door into a residence where Caye was staying. In reversing Caye's murder conviction, our Supreme Court recognized the well established principle that an inference of malice may be drawn from the fact that a deadly weapon had been used upon a vital part of another's body, *Id.*, 465 Pa. at 101, 348 A.2d at 137, but held that the inference of malice would not be permitted "where the

direct evidence presented in the Commonwealth's case *proves* the contrary." *Id.,* 465 Pa. at 101, 348 A.2d at 137 (emphasis added.) The Court further concluded that there was no justification for a finding of malice in that case.

Gelber's reliance upon *Caye* is misplaced. Here, unlike *Caye,* substantial physical and circumstantial evidence was presented to undermine Gelber's version of the incident, and his self-serving claim of self-defense simply falls short of *proving* an absence of malice. Gelber's claim depends upon a determination of credibility properly left to the jury; it follows that, if the jury disbelieved him, the inference of malice was free to arise from the nature of the killing. "It has long been the law of this Commonwealth that 'the use of a deadly instrument on a vital part of the body is sufficient to establish the specific intent to kill required for a conviction of murder.' " *Carbone,* 524 Pa. at 562–63, 574 A.2d at 590, (*quoting Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800, 802 (1972)). "[W]here there is evidence from which a jury can reasonably infer malice, the Commonwealth has met its burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *Carbone,* 524 Pa. at 562, 574 A.2d at 590 (citation omitted.)

Gelber argues separately that the Commonwealth failed to carry its burden of disproving self-defense. It is true that "when there is evidence at trial from whatever source that a killing may have been done in self-defense, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." *Commonwealth v. Eberle,* 474 Pa. 548, 554, 379 A.2d 90, 93 (1977) (*citing Commonwealth v. Cropper,* 463 Pa. 529, 537–38, 345 A.2d 645, 649 (1975)). This burden is met where the evidence establishes at least one of the following:

(1) that the defendant did not reasonably believe it was immediately necessary to kill in order to protect himself against death or serious bodily harm, or that the defendant used more force than was necessary or reasonably

appeared to him to be necessary to save himself from death, great bodily harm or the commission of a felony,

(2) that the defendant provoked the use of force, or

(3) that the defendant had a duty to retreat and that retreat was possible with complete safety.

*Commonwealth v. Fisher,* 491 Pa. 231, 420 A.2d 427 (1980) (citations omitted.)

■ Gelber argues that the Commonwealth's evidence failed to establish any of these elements, and thereby failed to rebut his claim of self-defense. He directs us to the facts of *Eberle* in support of this conclusion. In *Eberle,* the defendant was attacked in her apartment by a friend whom she stabbed a single time, killing him. The trial judge, sitting without a jury, expressly found that Eberle "believed that she was in danger of great bodily harm or death." *Eberle,* 474 Pa. at 554, 379 A.2d at 93. On review, the Court stated that "[i]n so finding, the trial court accepted the version of the incident related by [Eberle] from the witness stand." *Id.* The conviction was reversed, however, because the Court disagreed with the trial court's determination that such a belief was unreasonable. Unlike the defendant in *Eberle,* Gelber does not have the benefit of a finding that his version of the incident was, in fact, what occurred. Nor does he have the benefit of a finding that he actually believed himself to be in danger of death or serious bodily harm. Although the jury was instructed that it was free to so find and that such a finding would be a complete defense to the charges, a verdict of guilty was rendered.

Gelber also directs us to the facts of *Fisher, supra.* Fisher's testimony, corroborated by both Commonwealth witnesses and uncontradicted by any physical evidence, was as follows: Fisher and the victim met to settle a disagreement. The decedent exited his vehicle and shot Fisher in the thigh, causing him to fall to the ground. The decedent then approached, aimed the gun at Fisher's head and a struggle for the gun ensued. Fisher managed to grab the gun and began hitting the decedent about the head with it. Although the decedent was found alive at the scene, he died

shortly after at a hospital. Fisher was convicted of voluntary manslaughter and appealed. Our Supreme Court concluded that the second and third elements of self-defense were inapplicable, and thus reviewed the evidence only to determine whether the Commonwealth had proven, beyond a reasonable doubt, that Fisher did not reasonably believe himself to be in danger of death or serious bodily injury. In so doing, the Court concluded that the evidence did not support such a finding, and reversed.

As discussed, the Commonwealth here, unlike in *Fisher*, presents sufficient evidence from which a finder of fact could conclude that Gelber was the aggressor. By his own admission, Gelber had sole possession of the knife and Jimenez was unarmed when the stabbing began. Jimenez was stabbed twenty times, including fourteen times in the back. The Commonwealth's expert witness testified that the back wounds were likely inflicted from behind based upon their location and the angles at which they were inflicted. The jury may have found significant the fact that Gelber suffered no injuries in the struggle. Finally, expert testimony established that the wounds inflicted upon Jimenez' hands were consistent with the Commonwealth's theory that Jimenez was defending himself against a knife attack with empty hands. We believe that this evidence, if believed, is sufficient to support a finding that Gelber was not acting in self-defense.

Next, Gelber contends that the suppression court erred by admitting the statement that he made to Detective Dougherty. When reviewing an suppression court's denial of a motion to suppress evidence, our standard of review is well established.

> Our responsibility is to "determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings." *Commonwealth v. Hubble*, 318 Pa.Super. 76, 78, 464 A.2d 1236, 1237 (1983). Additionally, we must consider the prosecution's evidence and so much of the defendant's evidence as remain uncontradict-

ed. *Commonwealth v. Mancini,* 340 Pa.Super. 592, 490 A.2d 1377 (1985).

*Commonwealth v. Haynes,* 395 Pa.Super. 322, 577 A.2d 564 (1990).

In this case, we note that the suppression court denied the motion to suppress but did not make findings of fact or conclusions of law on the record, although such is required by Pa.R.Crim.P. 323(i). Both this court and our Supreme Court have expressly disapproved of this practice and have, when necessary, vacated judgment of sentence and remanded for a new suppression hearing. *See, e.g., Commonwealth v. Jackson,* 483 Pa. 101, 394 A.2d 930 (1978); *Commonwealth v. Spaulding,* 275 Pa.Super. 261, 418 A.2d 712 (1980); *Commonwealth v. DeSantis,* 337 Pa.Super. 70, 486 A.2d 484 (1984). Where possible, however, we have looked to the trial court's resolution of post-trial motions, as well as the record, in order to determine the propriety of suppression orders in these situations. *See, e.g., Commonwealth v. Guinther,* 290 Pa.Super. 441, 434 A.2d 834 (1981); *Commonwealth v. Haynes,* 395 Pa.Super. 322, 577 A.2d 564 (1990). We do so again today.

Gelber contends initially that his arrest was unconstitutional and that the resulting statements were, therefore, unlawfully obtained. He asserts that he was effectively arrested outside his home when he was told that he would not be permitted to reenter unaccompanied by a police escort.

In denying post-trial motions, the trial court stated that Gelber:

> was not at anytime prior to or during the meeting, ever told that he was under arrest. In fact, he was not restricted as to his movements, but was only informed that if he desired to go into the house he would have to be accompanied by a police officer to ensure the preservation of possible evidence.

Opinion of November 19, 1990, at 26.

Our review of the suppression transcript reveals that Detective Dougherty's testimony supports this finding.

Suppression Transcript, April 26, 1989, at 85, 91–92. Gelber contends, however, that he was effectively arrested when he was denied access to his home unescorted. Even were we to agree with Gelber that this action constituted an arrest, a conclusion we need not reach, Gelber fails to state how this would constitute an *illegal* arrest. Accordingly, this argument affords Gelber no relief.

Gelber argues in the alternative that, if in fact he was arrested once inside the house, as held by the suppression court, the arrest was an illegal violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). While *Payton* stands for the proposition that the Fourth Amendment prohibits a warrantless and nonconsensual *entry* into a suspect's home *in order to make a routine arrest, Payton*, 445 U.S. at 576, 100 S.Ct. at 1374–75, 63 L.Ed.2d at 644, it does not prohibit warrantless arrest from *occurring* within a home. Furthermore, we know of no reason to conclude that the arresting officer entered the home for the purpose of arresting Gelber. Indeed, the record reflects that Officer Dougherty could have arrested Gelber outside the home had he so desired; rather, he entered the home with Gelber for the purpose of preserving any evidence that might be present while allowing Gelber to use the bathroom. *Payton* simply does not apply to the facts before us.

Gelber also contends that the statement was obtained in violation of his right to counsel. In support of this position, Gelber states that he invoked the right by placing a telephone call to his brother-in-law to get a referral to an attorney, and that the statement was obtained following that call. Although the trial court did not specifically find that Gelber had or had not made the call, nor did the court conclude whether this would constitute an invocation of the right to counsel, the trial court did find that Gelber later reinitiated the conversation with Dougherty which led to the statement. The court also found that *Miranda* rights were read to Gelber immediately prior to the statement and that these rights were voluntarily waived. Again, this finding is

sufficiently supported by the record, and therefore this argument provides Gelber no relief.

Next, Gelber contends that the trial court committed reversible error by admitting evidence of his prior involvement with cocaine as both a user and seller. He argues that those transactions are unrelated to the instant case and are therefore inadmissible.

Gelber correctly states that evidence of a separate, unrelated crime is generally inadmissible to prove the crime for which a defendant is on trial. *Commonwealth v. Hall*, 523 Pa. 75, 85, 565 A.2d 144, 149 (1989) (*citing Commonwealth v. Morris*, 513 Pa. 169, 175, 519 A.2d 374, 376 (1986)). Where the evidence is relevant, however, "the mere fact that testimony of another crime may be prejudicial will not prevent its introduction into evidence." *Hall*, 523 Pa. at 85, 565 A.2d at 149, (*quoting Commonwealth v. Lasch*, 464 Pa. 573, 347 A.2d 690 (1975)). For example, prior crimes or bad acts are admissible where such evidence tends to establish any of the following: 1) motive; 2) intent; 3) absence of mistake or accident; 4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or 5) the identity of the person on trial as the person who committed the crime in issue. *Commonwealth v. Bond*, 261 Pa.Super. 311, 316, 396 A.2d 414, 416 (1978). Further, such evidence may be admitted to rebut statements in a defendant's confession which creates inferences especially favorable to him. *Commonwealth v. Roots*, 452 Pa. 535, 540, 306 A.2d 873, 876 (1973); *Commonwealth v. Saxton*, 516 Pa. 196, 207, 532 A.2d 352, 357 (1987).

Here, the Commonwealth's theory of the case was that Gelber was having severe financial difficulties. It introduced evidence that Gelber had been a dealer of cocaine previously and that he sought to pay his present debts by selling cocaine. The Commonwealth also introduced Gelber's statements that he had a "big problem" with cocaine, in part, because it was so expensive. The Commonwealth presented evidence that Wallace had introduced Gelber and

Jimenez in order that Gelber might purchase cocaine from Jimenez for resale, but that Gelber had no money with which to make such a purchase. Evidence was introduced to show that Jimenez and Gelber agreed to a substantial cocaine sale the day of the killing. Finally, the Commonwealth introduced the evidence, including the confession, that Gelber had killed Jimenez.

By contrast, Gelber's "confession" included a claim of self-defense. Gelber contends that he contacted Jimenez in order to purchase a small amount of cocaine for personal use, and that Jimenez attempted to rob him during the transaction.

In determining whether the evidence of prior drug dealing was properly admitted, we are guided by two decisions of our Supreme Court. In *Roots, supra.*, the defendant claimed that she had killed a man in self-defense. She claimed that she had seen him rob a bar, and that he had returned to retaliate, believing that she had identified him to the bar owner. The prosecution introduced evidence that the defendant had participated in the robbery with another individual, and that the decedent was not involved. Our Supreme Court stated:

> Appellant first argues that it was prejudicial error to permit the prosecuting attorney to make such remarks, since the Commonwealth failed to prove that she had in fact, participated in the robbery and any attempt to prove that he was a participant in the robbery would violate the rule that evidence of other crimes is generally not admissible, unless it indicates a common scheme or design. However, there is another rule which permits the Commonwealth to introduce evidence to rebut statements in a defendant's confession which creates inferences especially favorable to him. *See Commonwealth v. Rush*, 277 Pa. 419, 121 A. 111 (1923). In the instant case, appellant, in her statement, claimed that she killed in self-defense when the decedent threatened to kill her for reporting his involvement in a robbery. It was entirely appropriate under such circumstances for the Common-

·wealth to rebut these inferences by offering evidence to show that the decedent was not a robber and that the appellant was not a good Samaritan.

*Roots,* 452 Pa. at 540, 306 A.2d at 876.

In *Hall, supra.,* the Court held that evidence had been properly admitted where it "established that the victims were known drug dealers; further that the victims recently cheated the appellant in a drug deal and, finally that the appellant had killed the victims in revenge for cheating him. The prosecution's questions were designed to establish the appellant's motive for the killings." *Id.,* 523 Pa. at 85, 565 A.2d at 149.

Guided by these cases, we hold that the evidence in the instant case was properly introduced to rebut Gelber's self-defense theory, and to show that his motivation in killing Jimenez was not self-defense, but to procure cocaine for resale. Further, any prejudicial effect that might result from the references to Gelber's previous dealings in drugs was minimized when the Honorable Eugene H. Clarke, Jr., instructed the jury as follows:

You have heard evidence in this case tending to prove that the defendant was guilty of other misconduct for which he is not on trial. I'm speaking of the testimony to the effect that he participated in drug use and drug sales. This evidence is before you for a limited purpose. That is for the purpose of tending to show motive and to show the natural development of the facts. This evidence must not be considered by you in any way other than for the purposes I have just stated. You must not regard this evidence as showing that the defendant is a person of bad character or has criminal tendencies from which you might be inclined to infer guilt. If you find the defendant guilty it must be because you are convinced by the evidence that he committed the crimes charged and not because you believe he's wicked or has committed other offenses.

Notes of Testimony, October 6, 1989, at 11–12. ˙Cautionary instructions may suffice to eradicate any prejudice which

might result from reference to prior criminal activity by the defendant, *Commonwealth v. Morris*, 513 Pa. 169, 175, 519 A.2d 374, 376 (1986) (collecting cases), and we believe that the instructions provided here were sufficient.

 Gelber next complains that, in closing arguments, the prosecutor referred to him as a "stone-cold addict" who was "strung out on drugs" at the time of the incident. Gelber contends that he was prejudiced by these statements on the basis that the record fails to support such characterizations.

Our Supreme Court has addressed the extent to which the Commonwealth may argue its theory to the jury:

> The district attorney must limit his remarks to facts in evidence and legitimate inferences therefrom. The district attorney may not ask the jury to draw unwarranted deductions from the evidence. During summation, the district attorney must present the facts in a manner which allows the jury to dispassionately and objectively evaluate the testimony in a sober frame of mind and which produces a verdict warranted by the evidence, not one inspired by emotion.

*Commonwealth v. Anderson*, 490 Pa. 225, 229, 415 A.2d 887, 888–9 (1980) (citations omitted).

At trial, Detective Dougherty testified that, after Gelber asked to speak to him upstairs, Gelber stated that "coke was a big problem for him, and that he had no job and it had gotten to be very expensive." N.T., September 21, 1989, at 49. Detective Dougherty also testified that Gelber stated that "he needed help for the coke problem that he had because it was costing so much money." *Id.* at 51. Gelber testified that he had been using cocaine since high school. N.T., October 4, 1989, at 10. Even though he had serious financial problems, and testified that cocaine was a problem because "among other things it costs too much," *Id.* at 70, Gelber also testified that he continued to use cocaine once or twice monthly. *Id.* at 10. Gelber testified that he had bought and used cocaine the evening before the murder and was attempting to get more from Jimenez when

the incident occurred. *Id.* at 19–20. Finally, Gelber testified that his wife "may have" told him that she was going to leave him if he did not get into a drug treatment program. *Id.* at 70.

The prosecutor is not limited in a closing argument to reiterating the testimony and evidence presented; indeed, a function of the closing argument is to permit counsel to attempt to persuade the finder of fact as to the conclusions they should draw from the evidence produced at trial. *Commonwealth v. Brown,* 332 Pa.Super. 35, 480 A.2d 1171 (1984), is instructive. In that case, we stated:

> It is well established that a district attorney must have reasonable latitude in presenting a case to the jury and that he must be free to present his arguments with "logical force and vigor." *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986 (1980), *quoting Commonwealth v. Cronin,* 464 Pa. 138, 143, 346 A.2d 59, 63 (1975). His remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. *Commonwealth v. Fairbanks,* 453 Pa. 90, 306 A.2d 866 (1973); *Commonwealth v. Stevens,* 276 Pa.Super. 428, 419 A.2d 533 (1980).

*Brown,* 332 Pa.Super. at 44, 480 A.2d at 1176. While the evidence presented would not necessitate the inference that Gelber was addicted to cocaine or that his desire for the drug played a part in the motivation for the murder, we believe that the prosecution was free to argue in favor of that inference.

Finally, Gelber argues that he is entitled to a new trial based upon the recantation of testimony by Wallace. At trial, Wallace's testimony included the statement that he had never seen Jimenez with a weapon. After trial, he sought to recant that one aspect of his testimony.. At a hearing on the issue, Wallace testified that Detective Dougherty and the prosecutor had instructed him to lie regarding whether he had ever seen Jimenez with a weapon. In denying post-trial motions, Judge Clarke stated that, having observed Wallace's testimony both at trial and at the

hearing, he was not convinced of Wallace's truthfulness at the latter proceeding. Opinion at 29.

Our standard in reviewing the denial of a new trial based upon recanted testimony is set forth as follows:

The well-established rule is that an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion.

Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. There is no less reliable form of proof, especially when it involves an admission of perjury.

*Commonwealth v. Anderson,* 466 Pa. 339, 341–42, 353 A.2d 384, 386 (1976) (citations omitted.) The trial court, having had the opportunity to observe and judge the demeanor and credibility of the witness cannot be said to have abused its discretion in denying a new trial.

Judgment of sentence affirmed.