452 A.2d 809

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Frank STUMPO.**

Superior Court of Pennsylvania.

Submitted Nov. 4, 1981.

Filed Nov. 19, 1982.

Petition for Allowance of Appeal Denied Feb. 25, 1983.

448

450

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Nicholas J. Nastasi, Philadelphia, for appellee.

Before BROSKY, POPOVICH and MONTGOMERY, JJ.

BROSKY, Judge:

On January 1, 1978, while on duty as a Philadelphia policeman, appellee, Frank Stumpo, was involved in a series of incidents. As a result of these events, he was charged with eight criminal counts and brought to trial. During Stumpo's trial, the judge granted a demurrer to four of these charges. After the demurrers, the trial by jury continued, resulting in guilty verdicts on three counts. A post-verdict *en banc* court granted a motion in arrest of judgment on those three counts and discharged the defendant. The basis for this decision was their finding a Pa.R. Crim.P. 1100 violation. The Commonwealth has brought this appeal. We reverse two of the four demurrers [1] and remand for retrial on those reversed demurrers. The motion in arrest of judgment is also reversed and we remand for sentencing on the three convictions.

On January 1, 1978, Officer Stumpo, an on-duty, armed and uniformed Philadelphia police officer, became involved in a series of verbal and physical altercations with several people at the Sheraton Airport Motor Inn in Philadelphia. There was testimony at the trial to the following events.

Shortly after 2:00 a.m. on January 1, 1978, Ernest Funaro, a member of the band playing at the Sheraton that night, saw two uniformed Philadelphia police officers near the service bar. They were later identified as the defendant-ap-

---

1. As will be seen below, the unreversed demurrers were not reviewed on their merits. We did not review one of these demurrers because it was not properly before this court; and did not review another due to a potential double jeopardy violation.

pellee, Officer Stumpo, and his partner, Officer Dennis Mongello. Funaro testified that he saw Stumpo duck under the service bar opening and go into the bar area. After Mongello spoke to him, Stumpo came back out.

Shortly thereafter, Cynthia DeSpain, a cocktail waitress, attempted to leave the service bar and Stumpo blocked her way with his body. After asking him twice to move, she nudged him and he got out of her way. DeSpain cleared some tables and when she was back in the bar, Stumpo yanked on her brassiere strap several times, pulling her towards him. He also pulled down the top of her leotard off her shoulder. When DeSpain returned to the bar a second time, this time with glasses on a tray, Stumpo blocked her access again. DeSpain called for a security guard and Stumpo grabbed her arm and said, "All right bitch." DeSpain broke away and stayed behind the cashier's desk until Stumpo went elsewhere.

Stumpo then demanded a drink which the bartender initially refused because it was past the legal serving time. The manager was sent for and gave permission to serve Stumpo, who demanded and received a full glass of gin. He quickly downed that drink and then another. The evidence reveals that he then went from table to table mixing the dregs from used glasses and drinking the resulting alcoholic concoction.

The next series of episodes occurred in the hotel parking lot. The band members were loading their equipment on a van when Stumpo and his partner drove up in a patrol car and asked if they had any "booze." Stumpo then went into the van and began opening boxes and tossing them around. At one point he snatched a toaster oven box from Marilyn Johnson, a band member, tore it open and shoved it back at her, knocking her backwards. Crying, Johnson ran inside to get a security guard. Funaro also went to call the police at this point.

Stumpo was continuing to ransack the van when Leonard Benyak, a friend of a band member, asked him not to throw the boxes. Stumpo's response was, "Who the fuck are you?"

After demanding, and receiving, Benyak's identification, Stumpo announced, for no apparent reason, that he was going to arrest Benyak. As Benyak moved toward the police car, Stumpo grabbed him and shoved him stomach first onto the car hood.

Funaro returned from calling the police and Stumpo's attention was drawn to him. Again, Stumpo asked for identification and wanted to know who the leader was. Funaro characterized Stumpo's behavior as "very aggressive, very belligerent." Stumpo dropped the contents of Funaro's wallet and drunkenly staggered around.

Another band member, Stephen DeMarco, then came out to the parking lot. Again Stumpo asked, "Who the fuck are you?" Then, without any provocation, Stumpo slammed DeMarco against the van, grabbed his hair and pulled him down. DeMarco was hit two or three times on the head with a "very hard" "metallic" object which, due to his position, he could not see. Benyak, who was still on the scene, testified that Stumpo pulled out his revolver, aimed it, point-blank, at DeMarco's head and said, "I've got him." When Officer Mongello pulled Stumpo off DeMarco, the revolver was still in Stumpo's hand.

The police were then called again by another band member and Stumpo was overheard saying on the police radio that he did not need any assistance. He asked for, and received, DeMarco's identification which was dropped on the ground and scattered by the wind.

The third location of this bizarre chain of events was the hotel lobby. The band members had retreated to this lighted area and both police officers had followed them. One of the female members of the band was crying when two hotel managers happened to see this congregation of people. As it was after 3 a.m., they went to investigate. When one of the managers, Etkins, asked what was going on, Stumpo grabbed him by the jacket and shook him. The other manager, Flynn, spoke with Officer Mongello, and they agreed to get Stumpo outside. They approached Stumpo, one on each side, and took hold of his arms to pull him off

Etkins. Stumpo then turned on Flynn and throttled him with both hands around Flynn's neck. There was testimony that Flynn's breath was cut off and that he was lifted off the ground by the hold on his neck. Officer Mongello and a security guard separated Flynn and Stumpo. Shortly thereafter, a police lieutenant arrived and took Stumpo away.

### Demurrers

*Bill of information No. 505 charging defendant with an act of official oppression against Cynthia DeSpain.*

The trial judge granted a demurrer to this charge on the grounds that Stumpo's acts relating to this charge were not performed under color of authority. The Commonwealth counters that Stumpo was "an on-duty, uniformed member of the Philadelphia Police Department" and that therefore his acts were performed in an official capacity. We reverse this demurrer and remand for trial.

In relevant part the crime of official oppression is defined as:

> A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:
>
> (1) subjects another to . . . mistreatment . . .

18 Pa.C.S.A. § 5301.

Cynthia DeSpain's testimony about this incident is concise and provides a more vivid understanding of the events than a summary of them would. It is therefore quoted below in relevant part:

> I was starting to go under the service bar to go out and clean my tables and he was standing on the other side. . . And I asked him to move and he didn't. I asked him to move again, and he didn't. So I nudged him in the knee. And then he stood aside. Then I went out to clean my glasses, clean my tables. I brought my glasses back on a tray, and he pulled the back of my bra. I went out a second time, came back, and he blocked my way one (sic) again at the service bar entrance. And I asked him to

move, and he wouldn't. I called for security, and he grabbed me by the arm and he said, "All right, bitch." And that was—that was all that happened there.

Q. When the defendant grabbed you by the arm and said, "All right, bitch," what, if anything, did you have in your arm or hands?

A. I had a tray of glasses.

Q. What, if anything, happened to the tray of glasses?

A. The glasses fell off the tray...

Q. You said the defendant pulled your bra strap. Would you explain the circumstances under which that came about.

A. I was facing the wall of the service bar, and I was—I think I was putting my glasses on the bar. And he yanked the back of my bra strap and pulled me toward him a couple of times.

Another witness testified that, "One of the officers at that time, Officer Stumpo, did grab her leotard from the top and pulled it down over her shoulder." That witness characterized DeSpain's reaction as being "very angry." A third witness said that DeSpain "was really upset."

In granting the demurrer to this charge, Judge Guarino made the following oral remarks:

But this I am certain of: That we cannot accuse the defendant of official oppression as to Cynthia DeSpain. What he did with Cynthia DeSpain, he did not do under color of authority. That was the inception of his problems. And what he did in jocular mood and was taken as such, certainly he didn't do because he was an officer. He wasn't imposing himself on her because he had a uniform, but rather he was a man like any other, and we can't consider any such mistreatment or such conduct as being official oppression, because it doesn't fit the definition of official oppression. So I have also sustained the demurrer as to the bill charging him with official oppression as to Miss DeSpain.

We note at the outset that Stumpo's jocularity when he grabbed DeSpain's arm and called her a "bitch" is extremely doubtful. Further, there is no testimony to support the statement that it "was taken as such." Indeed all the evidence indicates that DeSpain was angry and upset.

■ The central issue raised by this demurrer is whether Stumpo's actions were within the definition of the statute. Judge Guarino concluded that Stumpo had not acted "under color of authority." It is true that Stumpo was not performing an official act, such as making an arrest, in his dealings with DeSpain. However, as we read the statute, there is no requirement that the forbidden acts be those which only an official could perform.

After stating its applicability to acts committed in an official capacity, the statute goes on to specifically include "taking advantage of such actual or purported capacity." We conclude that Stumpo's mistreatment of DeSpain was taking advantage of his official capacity.

In another area of the law, extortion, Judge Montgomery of this court examined the "color of office" concept. He stated that even a veiled threat to use the power of his office would suffice to meet this requirement. *Commonwealth v. Francis*, 201 Pa.Super. 313 at 322, 191 A.2d 884 at 889 (1963). We recognize that neither the same exact terminology nor the same crime is involved here; but as we interpret this previously unexamined area of the law, we choose to reason by analogy to this allied subject matter.

A policeman wearing his badge of office, his uniform, pistol and nightstick carries with him at all times two unstated veiled threats, two capabilities: one is the use of force, the other is the power to arrest. These capabilities are known to people with whom the police officer deals and, together with a proper respect for his office, they engender an attitude of circumspection and deference. This attitude is greatly to the advantage of the police themselves. It affords them an important measure of protection and enables them to perform their official duties. Of course, it is

also in the interests of the state to encourage this attitude. Thus, it becomes all the more important that improper actions taking advantage of this authority be within the scope of the crime of official oppression. The legislature has clearly provided for this coverage with the broad language of the statute.

█ The powers of a police officer to use force and to arrest are formidable. The implicit recognition of these powers by the public in dealing with a police officer is both usual and desirable. Therefore, while exceptions are conceivable, we hold as a general rule that a police officer in uniform[2] is cloaked with the authority of his office; and that actions taken by him which constitute mistreatment of another may fairly be said, within the terms of the statute, to be "taking advantage" of that authority.

We reverse the demurrer on this charge and remand for retrial.

*Bill of information No. 78–06–502 charging defendant with the simple assault of Leonard Benyak.*

The testimony concerning the incident involving Benyak and Stumpo reveals the following. Leonard Benyak was a friend of a singer in a band which had been performing at a hotel in Philadelphia. After the band had finished playing, Benyak carried a box of band equipment out to a trailer. As Benyak approached the trailer, he saw Officer Stumpo inside it with a box in his hands and heard a band member protesting Stumpo's searching through the boxes.[3]

Benyak testified that Stumpo threw a box against an inner wall of the trailer. Benyak then said, "Look all you want but don't throw the boxes against the side of the trailer." Stumpo turned around, moved toward Benyak and

---

**2.** Of course, the same would be true of a plainclothes police officer known to be such by the persons with whom he was dealing.

**3.** There was testimony that before Benyak's arrival on the scene, Officer Stumpo and his partner had driven up in a patrol car and one of them had asked, "Do you have any booze in there?" There was no testimony regarding any criminal act relating to the trailer other than Stumpo's acts, or to any probable cause for a warrantless search.

Benyak backed out of the trailer. Stumpo then asked Benyak, "Who the fuck are you? Are you the leader?" Benyak replied that he wasn't and that he was just helping. Stumpo asked Benyak for identification; and as Benyak was getting his wallet out, Stumpo told Benyak, "I'm going to take you in." Benyak replied, "Fine, let's go downtown" and moved toward the police car. At this point, Stumpo spun Benyak around and shoved him, forcing him to land on his stomach on the hood of the police vehicle.

Benyak testified: "I felt that my safety was in jeopardy, because it appeared that his equilibrium was unstable, and he just didn't look like he had total control of his faculties. . . . So I was concerned about staying there with him. . . . I was concerned that I could either be hit or something worse at that time." He also testified that Stumpo was weaving, having difficulty standing up and regaining his balance and was not behaving rationally.

The crime of simple assault is defined in relevant part as follows:

A person is guilty of assault if he:

(1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another; . . .

(3) attempts by physical menace to put another in fear of imminent serious bodily injury.

18 Pa.C.S.A. § 2701.

 Since a demurrer is a purely legal determination, the standard of review of a granted demurrer is the same standard that the trial court applies.

The test to be applied in ruling on a demurrer is whether the evidence and all reasonable inferences therefrom are sufficient to support a finding by the jury that the defendant was guilty beyond a reasonable doubt.

*Commonwealth v. Duncan,* 473 Pa. 62 at 66, 373 A.2d 1051 at 1053 (1977). " . . . and in making our determination we must read the evidence in the light most favorable to the

Commonwealth." *Commonwealth v. Bey,* 221 Pa.Super. 405 at 406, 292 A.2d 519 at 520 (1976).[4]

Benyak testified that he was not injured and there was no evidence to contradict this. While causing bodily injury could not, therefore, have been proved, another alternative ground for commission of the crime remains.[5]

■ Could a jury have properly found that Stumpo attempted by physical menace to put Benyak in fear of imminent, serious bodily injury? (This would meet the terms of subsection (3)). From Benyak's testimony, quoted above, a jury certainly could have found that Benyak actually was "in fear of serious bodily injury." He directly stated as much. Proof of the fear itself is relevant, but does not establish the violation.

■ The precise question before us is whether they could have found that Stumpo *attempted* by physical menace to put Benyak in such fear. Proof of that attempt can be provided by Stumpo's actions. The focus then becomes: Can an attempt to put Benyak in fear of bodily injury be inferred from the nature of Stumpo's acts? We find that the jury would have been justified in making that inference.

In reaching this conclusion, we have tried to sense the situation from the point of view of the participants at the time the events were occurring. The target of the acts described above would have been insensate had he not been afraid. Furthermore, Stumpo can fairly be said to have attempted to induce that fear. Accordingly, the demurrer to this charge is reversed and we remand for retrial on this charge.

4. Judge Guarino did not state his reasons for granting this particular demurrer.

5. As we find that the demurrer was improperly granted because a subsection (3) violation could have been proven, we will not reach the additional argument that Stumpo attempted to cause bodily harm.

*Bill of information No. 78–06–499 charging defendant with recklessly endangering Stephen DeMarco.*

■ Defendant was charged with three counts relating to the same incident with DeMarco: reckless endangerment,[6] simple assault,[7] and aggravated assault.[8] A demurrer was granted on the reckless endangerment charge and the jury found Stumpo not guilty of aggravated assault and guilty of simple assault.

The appellee contends that elements of the crimes that reached the jury are also present in the charge of reckless endangerment and that, therefore, collateral estoppel bars retrial on that charge. We do not decide this collateral estoppel issue because the Commonwealth concedes its application.

*The admitted existence of this bar to a new trial* does not render the Commonwealth's appeal as to this information moot since the collateral estoppel question would be ripe for disposition only if the Commonwealth moved for trial of this information on remand following this appeal.[9] (Emphasis supplied.)

Since the Commonwealth has admitted the collateral estoppel bar to retrial, we also decline to review the demurrer on this charge.

*Bill of information No. 78–06–503 charging defendant with aggravated and simple assault of James Flynn.*

In his demurrer to this charge, Judge Guarino stated:

As to Bill 503, Simple and Aggravated Assault, that bill charging the defendant with committing an act of aggravated assault and simple assault on one James Flynn: Two witnesses did testify in this case supportive of the fact that there could have been or might be an assault or an aggravated assault. Grabbing one by the throat, cut-

**6.** 18 Pa.C.S.A. § 2705.

**7.** 18 Pa.C.S.A. § 2701.

**8.** 18 Pa.C.S.A. § 2702.

**9.** Reply brief for appellant.

ting off his breath, strangling him, lifting him off the ground, persisting in that conduct does have all the qualities of an aggravated assault. What disturbs the Court is that the victim does not support that theory. The victim says that he suffered no injury and the only thing that he did suffer was a discomfort. When I juxtapose the definition of aggravated assault with that or even simple assault with that, I don't find that it rises to that level as to constitute the crime of aggravated or simple assault.

So I have granted the demurrer as to that.

■ Because of the nature of Judge Guarino's remarks, we are unable to review this demurrer. Ordinarily, a demurrer raises only legal questions and thus can be appealed by the Commonwealth with no bar to retrial. *Commonwealth v. Long,* 467 Pa. 98, 354 A.2d 569 (1976). However, when a demurrer is granted on factual instead of legal grounds, a retrial on that charge would work a violation of the double jeopardy clause of the Fifth Amendment: "... nor shall any person be subject for the same offense to be twice put in jeopardy..." This protection accorded a criminal defendant is applicable to a state prosecution through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

■ In granting the demurrer to this charge, Judge Guarino appears to have been weighing the credibility of the various witnesses and noting discrepancies in their respective testimony. This is, of course, a role for the fact finder. The proper function of the trial judge was to determine whether there was sufficient evidence, if believed, to have allowed a jury to find the defendant guilty. (A more detailed treatment of this standard is given in the prior section of this opinion.)

Because the trial court exceeded its proper scope by invading the province of the jury to act as a fact finder in the way it ruled on the demurrer, retrial is barred. Nor is it dispositive that the ruling was called a demurrer. "... the trial judge's characterization of his own action cannot control the classification of the action..." *United States v.*

*Jorn,* 400 U.S. 470 at 479, n. 7, 91 S.Ct. 547 at 554, n. 7, 27 L.Ed.2d 543 (1971).

This issue has been decided by the Pennsylvania Supreme Court. *Commonwealth v. Wimberly,* 488 Pa. 169, 411 A.2d 1193 (1979). Justice O'Brien's rationale in that case followed the U.S. Supreme Court opinion of *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed. 642 (1977). In *Wimberly,* as in the case before us, the trial judge had passed upon the credibility of witnesses in granting a demurrer. The Commonwealth's appeal was dismissed, to avoid a double jeopardy situation. What the trial judge actually did, not what he said he did, was dispositive. "The trial court in the instant case, while characterizing its actions as the granting of a demurrer, actually entered a *de facto* judgment of acquittal." *Wimberly,* supra, 488 Pa. at 173, 411 A.2d at 1195.

In the case before us, Judge Guarino also entered a "*de facto* judgment of acquittal." We cannot, therefore, review the demurrer on its merits, and consequently it stands. Justice O'Brien's remarks in the *Wimberly* case, supra, about irregular actions of a trial court judge are most applicable when he stated:

We do not condone that practice in the instant case, nor do we anticipate the practice will be indulged in future cases.

*Wimberly,* supra, 488 Pa. at 172, 411 A.2d at 1194.

### Arrest of Judgment

After the trial, Judge Guarino authored an opinion for a three-judge *en banc* court which granted an arrest of judgment due to a pre-trial Rule 1100 violation. We reverse this order and remand for sentencing on the three convictions.

The relevant procedural history follows.[10] During the period concerning us here, the Rule 1100 run-date for Stumpo's trial to begin was November 20, 1978. On October 27, 1978, Judge Guarino declared a mistrial in *Commonwealth v.*

**10.** Numerous procedural events occurred in addition to those recounted in this opinion. They do not relate to the issue before this court and are therefore not included here.

*Murphy,* another case in which a police officer was charged with assault and related crimes while allegedly acting in an official capacity.

As a result of this mistrial, on November 2, 1978, the Commonwealth filed a motion to disqualify Judge Guarino in the instant case, which was scheduled for trial before him on November 6.

4. During the *Murphy* trial, the Court made statements both on and off the record which indicated a clear prejudice by the Court against criminal prosecutions of police officers by the District Attorney's Office. For example, on at least four occasions, the Court stated that the District Attorney's Office should not prosecute police brutality cases since to do so impairs the relationship between the District Attorney's Office and the police.

5. The Court further demonstrated its prejudice by maligning, without any factual basis, the motives of the prosecution. For example, on innumerable occasions both on and off the record, the Court stated that the prosecution of *Murphy* was politically motivated and that as a result the purpose of the District Attorney's Office was not to get to the truth of the matter but, rather, to "infect" the case with prejudicial error. On numerous other occasions, both on and off the record, the Court accused the District Attorney's Office of "over-reaching" and being "over-zealous" out of a desire to convict a police officer for political gain. None of the Court's accusations had factual basis.

6. The rulings of the Court on legal questions were clearly influenced by the prejudice.

7. On numerous occasions on and off the record, the Court likened the jury to "tinder" waiting to have its passions ignited by the introduction of the issue of police brutality into the courtroom.

This motion ended with the following paragraph:

Should the Court believe that disposition of this motion will require resolution of any factual matter raised herein, it is requested that the matter be referred to the calendar

room judge for purposes of fact finding and disposition. ABA Standards Relating to Trial Courts, § 2.32. Additionally, should a factual resolution be deemed necessary, it is required that the notes of testimony of *Murphy* be transcribed forthwith.

Motion to Disqualify the Assigned Trial Judge.

Judge Guarino declined to have this matter decided by another judge and held a hearing on November 6. At this hearing, he indicated that he could decide the matter without the notes of testimony of the *Murphy* trial as soon as November 12; but that if those notes were desired by the Commonwealth to aid in making the decision that it would take thirty days or longer under those circumstances.

By letter the following day, the Commonwealth withdrew their request that the transcript of the *Murphy* trial be provided prior to a determination of the issue. In that letter, they stated that the transcript would not be necessary since Judge Guarino, and not another judge, as they had requested, would be deciding the matter. Judge Guarino, they stated, was already familiar with his own "commentary and actions during the Murphy trial" which had just recently taken place. The Commonwealth also expressed concern that the motion be ruled on immediately and without briefs so that the trial could commence before the run-date.

Judge Guarino then held a second hearing on November 10, at which he directed the Commonwealth to file a brief by November 17 and scheduled a third hearing for the run-date, November 20.

The Commonwealth filed on November 14 a petition to extend under Rule 1100(c). A hearing on this motion was held on November 20 before Judge Marutani, the Jury Calendar Judge. At the conclusion of the hearing, an extension was granted to ninety days after the disqualification decision.

A third hearing on the recusal motion was held before Judge Guarino, also on November 20. At that time, the motion was held under advisement. The notes of testimony

of the Murphy trial were filed on January 18, 1979 and Judge Guarino's opinion dismissing the disqualification motion was filed on March 29, 1979.

After other delays which are not relevant here, the trial began before a jury on October 15, 1979, resulting in a conviction on three counts on November 15, 1979. A hearing on defendant's post-trial motions was held on May 19, 1980 before a court *en banc* consisting of Judges Guarino, Wallace and Durham. Judge Guarino then issued an opinion on February 5, 1981, joined in by Judge Wallace and in which Judge Durham joined only the result. That opinion held that a Rule 1100 violation had been committed by Judge Marutani's extension order of November 20, 1979. The motion in arrest of judgment was consequently granted and the defendant discharged. It is this order that is now before us on appeal.

Three grounds are given in the *en banc* opinion for finding a violation of Stumpo's Rule 1100 rights. We will treat each one in turn.

■ First, the Commonwealth is said to have not exercised "due diligence" in bringing defendant to trial within the prescribed time. *Commonwealth v. Mayfield,* 469 Pa. 214 at 222, 364 A.2d 1345 at 1349 (1976). The motion to disqualify was characterized by the *en banc* court as "a dilatory motion that unquestionably was designed to delay defendant's trial" and therefore constituted a lack of due diligence. We reject this conclusion.

There is no evidence whatsoever on the record that the Commonwealth was not able and willing to go to trial on or before the November 20 run-date. Quite to the contrary, there are ample indications that the prosecution was not interposing the motion to disqualify merely as a delaying tactic. The motion to disqualify was filed with reasonable promptness after the event which occasioned it. On November 7, the Commonwealth requested that Judge Guarino rule on the motion to disqualify immediately, without waiting for briefs or for a transcript of a trial over which he had just

presided. Lastly, during the November 20 hearing on the Commonwealth's petition to extend, the Assistant District Attorney stated unequivocally: "I'm ready to proceed to move to trial today..." Judge Marutani then offered to assign someone other than Judge Guarino to the trial, if the defense was willing—which they were not. If any dilatory actions were taken during the prolonged course of the prosecution, they are the responsibility of the defendant and the Court, not of the prosecution.

The other basis for finding a lack of due diligence was that "the petition was patently frivolous." It is not our function here to review the trial court's decision on the motion to disqualify. The Commonwealth chose not to appeal that ruling. The task before us is to determine whether that motion was so completely without merit that the Commonwealth was irresponsibly delaying the trial in making it. We have carefully considered the opinion of this court in *Commonwealth v. Murphy,* 282 Pa.Super. 274, 422 A.2d 1113 (1980); the motion to disqualify itself; the transcript of Stumpo's trial and our other holdings in this opinion. This review has led us to one conclusion: that the motion to disqualify was not patently frivolous.

The third basis for a Rule 1100 violation was "that the extension of ninety (90) days beyond the decision of Judge Guarino was without evidentiary foundation and arbitrary." We find this characterization not supported by the law.

In the leading Rule 1100 case, *Commonwealth v. Mayfield,* 469 Pa. 214, 364 A.2d 1345 (1976), the cause of the requested extension was the lack of available courtrooms. The *Mayfield* opinion held that where courtroom availability was the cause, "... the policies which prompted the adoption of Rule 1100 would not be served by disallowing a reasonable, limited extension 'specifying the date or period within which trial shall be commenced.'" *Mayfield,* supra, 469 Pa. at 220, 364 A.2d at 1348. This statement was quoted with approval in *Commonwealth v. Gibson,* 248 Pa.Super. 348 at 352, 375 A.2d 132 at 134 (1977). The situation in *Gibson* parallels the

one before us: the initial cause of the extension was not courtroom availability, but that became a valid factor in computing the term of the extension. In setting the 90-day limit after the decision on the motion to disqualify, Judge Marutani properly took into consideration courtroom availability. The propriety of this entering into his considerations is not an open point of law. Further, we find that this was a "reasonable, limited extension."

Judge Guarino's post-trial opinion faults Judge Marutani for making the ninety-day post ruling extension "without evidentiary foundation." On May 29, 1980, just after the post-trial hearing, Judge Marutani wrote a memo to Judge Guarino. As it is quoted in Judge Guarino's opinion, this memo stated that:

(t)his evaluation was made by the Calendar Judge who knew better than anyone in the court system the up-to-date status of cases in the felony program; to suggest that such a judge should make inquiry of those with lesser knowledge would have been serving form, and not consistent with reality.

Post-trial *en banc* opinion, quoting a May 29, 1980 memo from Judge Marutani to Judge Guarino.

We find this eminently reasonable. A judge who has an intimate, ongoing knowledge of the court calendar should be able. to take judicial notice of that knowledge. *Commonwealth v. Jackson,* 269 Pa.Super. 249 at 253–4, 409 A.2d 873 at 875 (1979).

As we have rejected all three grounds on which the *en banc* court found a Rule 1100 violation, we reverse the arrest of judgment and remand for sentencing on the following three convictions: Bill No. 504, simple assault of DeMarco; Bill No. 506, official oppression of Flynn; Bill No. 507, official oppression of Benyak. Our reversal of the Rule 1100 violation also permits retrial on the two counts on which we reversed the demurrers. We remand for retrial on those two reversed demurrers: Bill No. 503, aggravated and

468

simple assault of Flynn; Bill No. 505 official oppression of DeSpain. This court relinquishes jurisdiction of this case.

POPOVICH, J., concurs in result.